## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SELWYN KARP<br>32 MERRALL DRIVE<br>LAWRENCE, NY 11559<br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>           Plaintiff,<br><br>      v.<br><br>FIRST CONNECTICUT BANCORP, INC.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br>SERVE ON: THE CORPORATION TRUST<br>  INCORPORATED<br>2405 YORK ROAD, SUITE 201<br>LUTHERVILLE TIMONIUM, MD 21093<br><br>JOHN J. PATRICK, JR.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>RONALD A. BUCCHI<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>JOHN A. GREEN<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>JAMES T. HEALEY JR.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>PATIENCE P. MCDOWELL<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>KEVIN S. RAY<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>And<br><br>MICHAEL A. ZIEBKA,<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>           Defendants. | **Case No.:** _____<br><br><br>**CLASS ACTION**<br><br><br>**COMPLAINT FOR VIOLATION OF THE**<br>**SECURITIES EXCHANGE ACT OF 1934**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Selwyn Karp ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and all other similarly situated public shareholders of First Connecticut Bancorp, Inc. ("First Connecticut" or the "Company") against First Connecticut and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with First Connecticut, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of First Connecticut by People's United Financial, Inc. ("People's United").

2.      On June 18, 2018, First Connecticut and People's United entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which First Connecticut will merge with and into People's United, with People's United continuing as the surviving corporation (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, each share of First Connecticut common stock issued and outstanding will be converted into the right to receive 1.725 shares of People's United common stock (the "Merger Consideration").

4.      On July 25, 2018, in order to convince First Connecticut's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a

materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.    In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for First Connecticut, People's United, and the Synergies expected to result from the Proposed Transaction; (ii) the valuation analyses performed by First Connecticut's financial advisor, Piper Jaffray & Co ("Piper Jaffray"), in support of their fairness opinion; and (iii) the background process leading to the Proposed Transaction.

6.    The special meeting of First Connecticut's shareholders to vote on the Proposed Transaction is forthcoming, as the Proposed Transaction is expected to be completed in the fourth calendar quarter of 2018.  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the shareholder vote so First Connecticut shareholders can properly exercise their corporate suffrage rights.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to First Connecticut's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Section 14(a) and 20(a) of the Exchange Act.

9.      This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under 28 U.S.C. § 1391, because First Connecticut is incorporated in this District, some of the transaction and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and has been at all times relevant hereto, a common shareholder of First Connecticut.

12.     Defendant First Connecticut is a Maryland corporation with its principal executive offices located at One Farm Glen Boulevard, Farmington, Connecticut 06032.  First Connecticut is the holding company of Farmington Bank, which has 25 branch locations throughout central Connecticut and western Massachusetts.  First Connecticut common stock is traded on the NASDAQ under the ticker symbol "FBNK."

13.     Defendant John J. Patrick, Jr. is, and has been at all relevant times, a director of First Connecticut, and currently serves as the Company's President and Chief Executive Officer and Chairman of the Board.

14.     Defendant Ronald A. Bucchi is, and has been at all relevant times, a director of

First Connecticut.

15.     Defendant John A. Green is, and has been at all relevant times, a director of First Connecticut.

16.     Defendant James T. Healey Jr. is, and has been at all relevant times, a director of First Connecticut.

17.     Defendant Patience P. McDowell is, and has been at all relevant times, a director of First Connecticut.

18.     Defendant Kevin S. Ray is, and has been at all relevant times, a director of First Connecticut.

19.     Defendant Michael A. Ziebka is, and has been at all relevant times, a director of First Connecticut.

20.     The parties in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with First Connecticut, the "Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of First Connecticut (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

    (a)     the Class is so numerous that joinder of all members is impracticable.  As of July 23, 2018, there were approximately 16.04 million shares of First Connecticut common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual

number of public shareholders of First Connecticut will be ascertained through discovery;

(b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act;

    ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    Company Background and the Proposed Transaction

23.    First Connecticut was incorporated in 2011 and is the holding company of Farmington Bank.  Established in 1851, Farmington Bank is a diversified consumer and commercial bank with an ongoing commitment to contribute to the betterment of the communities in our region.  Farmington Bank has 25 branch locations throughout central Connecticut and western Massachusetts, offering commercial and residential lending as well as wealth management services.  At March 31, 2018, First Connecticut on a consolidated basis, had total assets of $3.14 billion, total deposits of $2.44 billion, and stockholders' equity of $277 million.

24.    People's United is the holding company of People's United Bank.  As of March 31, 2018, People's United had total consolidated assets of $44.1 billion, approximately 400 branches across six states, and approximately 600 ATMs.  A diversified financial services company founded in 1842, People's United provides consumer, commercial, insurance, retail investment, and wealth management and trust services to personal and business banking customers.

25.    On June 19, 2018, First Connecticut issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**People's United Financial To Acquire First Connecticut Bancorp, Inc.**

BRIDGEPORT, Conn., June 19, 2018 (GLOBE NEWSWIRE) --
People's United Financial, Inc. (NASDAQ: PBCT), the holding
company for People's United Bank, N.A., announced today an
agreement to acquire First Connecticut Bancorp, Inc. (NASDAQ:
FBNK), of Farmington CT, the holding company for Farmington
Bank, in a 100% stock transaction valued at approximately $544
million. Completion of the transaction is subject to customary
closing conditions, including receipt of regulatory approvals and
the approval of First Connecticut Bancorp, Inc. shareholders.

"We are excited to welcome Farmington Bank to People's United,"
said Jack Barnes, CEO, People's United Financial. "They have a
long-standing relationship-based approach to serving their
customers and complementary commercial and retail capabilities.
This, coupled with their experienced team and similar culture, will
strengthen our well-established presence in the region."

"People's United Bank is a premier brand with a rich 176-year
history in the state of Connecticut," said John Patrick, Chairman,
President and CEO, Farmington Bank. "Our customers will benefit
from their broader array of products, enhanced access to
technology and digital capabilities, as well as the bank's seven-
day-a-week Stop & Shop branch locations."

Established in 1851, Farmington Bank is a community bank with
28 branches throughout Central Connecticut and Western
Massachusetts. With $3.1 billion in assets, the bank has built a
strong balance sheet by focusing on commercial and retail banking.
Barnes added, "As with the People's United Community
Foundation, Farmington Bank has a strong commitment to
community giving. With our shared focus, we will continue to
positively impact the lives of individuals, families and businesses
throughout Hartford County."

People's United expects the transaction to be $0.05 accretive to
earnings per common share based on fully phased-in cost savings,
with a tangible book value earn-back of approximately 3.5 years
and an IRR of approximately 18%. The transaction is expected to
close during the fourth quarter of 2018.

Under the terms of the agreement, which has been approved by
both companies' boards of directors, First Connecticut Bancorp,
Inc. shareholders will receive 1.725 shares of People's United

Financial stock for each First Connecticut Bancorp, Inc. share. The transaction is valued at $32.33 per First Connecticut Bancorp, Inc. share, based on the closing price of People's United's common stock on June 18, 2018.

Keefe, Bruyette & Woods, Inc. served as financial advisor to People's United and Simpson Thacher & Bartlett LLP served as legal counsel to People's United.

Piper Jaffray & Co. served as financial advisor to First Connecticut Bancorp, Inc. and Hinckley Allen & Snyder LLP served as legal counsel to First Connecticut Bancorp, Inc.[1]

26.    The Merger Consideration the Company's shareholders stands to receive if the Proposed Transaction is consummated is unfair and inadequate because, among other things, the intrinsic value of the First Connecticut is materially in excess of the amount offered given the Company's prospects for future growth and earnings.

27.    For example, on January 13, 2018, the Company announced its Fourth Quarter 2017 Financial Results.  During the earnings call, Company CEO John Patrick commented that "2017 was a good year for [the Company]," particularly "in light of the fact that [First Connecticut] didn't open any branches during 2017."[2]  However, John Patrick also noted that Company would be opening a new office in Manchester in March that he anticipated would be a "great success."  *Id.*

28.    Subsequently, on April 6, 2018, the Company announced its First Quarter 2018 Financial Results.  Just as John Patrick mentioned during the prior quarter's earnings call, the Manchester location was a huge success.  After only being open three or four weeks, the

---

[1]    First Connecticut Bancorp Inc., Press Release (June 19, 2018), *available at* http://www.firstconnecticutbancorp.com/file/Index?KeyFile=393932616.

[2]    *First Connecticut Bancorp's (FBNK) CEO John Patrick on Q4 2017 Results - Earnings Call Transcript*, Seeking Alpha (Jan. 25, 2018), *available at* https://seekingalpha.com/article/4140221-first-connecticut-bancorps-fbnk-ceo-john-patrick-q4-2017-results-earnings-call-transcript.

Manchester office secured $25 million in deposits with 480 new customers.[3]

29.     In addition to the Manchester location's success, the Company had achieved "deposit growth in the quarter, $9.3 million bring us to about $2.4 billion for our deposits, which is a 7% increase from a year ago." *Id.*

30.     Greg White, the Company's Chief Financial Officer, also commented on the quarter's positive results, noting that "net interest income growth it was up 2% versus the prior quarter, up 9% from the same period last year." *Id.*

31.     Furthermore, the Company's tangible book value per share increased from $17.08 on a linked quarter basis and $16.62 at March 31, 2017, to $17.32 for the quarter ended March 31, 2018.[4]

32.     As seen above, First Connecticut has demonstrated that it is poised for considerable growth in 2018.

33.     Accordingly, iIt is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.    The Materially Incomplete and Misleading Proxy**

34.     On July 25, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to First Connecticut's shareholders.  The Proxy solicits

---

[3]     *First Connecticut Bancorp's (FBNK) CEO John Patrick on Q1 2018 Results - Earnings Call Transcript*, Seeking Alpha (April 19, 2018), *available at* https://seekingalpha.com/article/4164175-first-connecticut-bancorps-fbnk-ceo-john-patrick-q1-2018-results-earnings-call-transcript?part=single.

[4]     *First Connecticut Bancorp, Inc. reports first quarter 2018 net income of $6.0 million or $0.38 diluted earnings per share*, Seeking Alpha (April 18, 2018), *available at* https://seekingalpha.com/pr/17133996-first-connecticut-bancorp-inc-reports-first-quarter-2018-net-income-6_0-million-0_38-diluted.

the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

35.    First, the Proxy fails to provide First Connecticut's after-tax cash flow projections. First Connecticut's cash flows were utilized by Piper Jaffray in their valuation analyses, including their discounted cash flow ("DCF") analysis for First Connecticut, and are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear—is the Merger Consideration fair compensation given the expected cash flows? Without First Connecticut's after-tax cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

36.    Similarly, the Proxy also fails to disclose People's United's after-tax cash flow projections. People's United's cash flows were also utilized by Piper Jaffray in their valuation analyses, including their DCF analysis for People's United, and are material to the Company's shareholders. As mentioned above, investors are concerned, perhaps above all else, with the cash flows of the companies in which they invest. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear—is the

Merger Consideration fair compensation given the after-tax cash flows *of the company that First Connecticut will be merging with*?  Indeed, complete disclosure of People's United's expected after-tax cash flows are particularly material in light of the fact that the Merger Consideration is comprised of stock in another company: People's United.  Without People's United's after-tax cash flows projections, the Company's shareholders will not be able to assess the fairness of the Merger Consideration.

37.     Likewise, the Proxy states that Piper Jaffray reviewed and considered the Synergies that are expected to result from the Proposed Transaction.  *See* Proxy at 49.  Indeed, Piper Jaffray's DCF analysis for People's United analyzed People's United "on a stand-alone basis and on a pro forma basis, which included the Synergies."  *See* Proxy at 56.  However, the Proxy fails to disclose the Synergies, despite the fact that they are material to the Company's shareholders.  Given the importance of the Synergies to First Connecticut shareholders and their impact on Piper Jaffray's DCF analysis, the failure to disclose the Synergies renders the Proxy incomplete and misleading.

38.     Numerous courts have championed the importance of management based financial projections because a company's management has unique insight into their firm's future that the market does not.  Shareholders cannot hope to replicate management's inside view of the Company's prospects.  The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making.

39.     By electing to disclose *some* of First Connecticut's projections, Defendants' obligated themselves to speak the ***whole truth*** regarding First Connecticut's projections by providing ***complete and accurate*** projections because if a proxy discloses financial projections and valuation information, such ***projections must be complete and accurate***, rather than cherry-

picking favorable financial metrics to disclose.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

40.    The Proxy describes Piper Jaffray's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Piper Jaffray's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, First Connecticut's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Piper Jaffray's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to First Connecticut's common shareholders.

41.    With respect to Piper Jaffray's *Discounted Cash Flow Analysis* for First Connecticut, the Proxy fails to disclose: (i) First Connecticut's projected after-tax cash flows for the fiscal years 2018 through 2023; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 11.0% to 13.0%; (iii) the inputs and assumptions underlying the calculation of the 8.0% earnings growth rate; and (iv) the terminal value of First Connecticut. *See* Proxy at 55.

42.    With respect to Piper Jaffray's *Discounted Cash Flow Analysis* for People's United, the Proxy fails to disclose: (i) People's United's projected after-tax cash flows for the fiscal years 2018 through 2023; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 9.0% to 11.0%; (iii) the inputs and assumptions underlying the calculation of the 7.0% earnings growth rate; (iv) the terminal value of People's United; and (v) the

Synergies, which were included in the pro forma analysis.  *See* Proxy at 56.

43.     These key inputs are material to First Connecticut's common shareholders, and their omission renders the summary of Piper Jaffray's DCF analyses for First Connecticut and People's United incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, "there is [] an element of subjectivity present in the choice and application of these [valuation] methods" and that the banker's key choices can have a substantial "effect the outcome of a valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1573-74 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  With respect to a discounted cash flow analysis, Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, First Connecticut shareholders cannot evaluate for themselves the reliability of Piper Jaffray's DCF analyses, make a meaningful determination of whether the implied per share reference ranges reflect the

true value of the Company or was the result of Piper Jaffray's unreasonable judgment, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

44.    With respect to Piper Jaffray's *Comparable Transactions Analysis*, the Proxy fails to disclose the individual multiples Piper Jaffray calculated for each transaction utilized.  The omission of these multiples renders the summary of the analysis and the implied value per share ranges materially misleading.  A fair summary of the *Comparable Transactions Analysis* requires the disclosure of the individual multiples for each transaction; merely providing the low, mean, median, and high multiples that a banker applied is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate transactions and applied appropriate multiples, or, instead, selected certain transactions that yielded unreasonably low multiples in order to drive down the implied value per share ranges.  *See* Proxy at 54-55.  Accordingly, Piper Jaffray's *Comparable Transactions Analysis* is materially incomplete and misleading, and the individual multiples for each company observed must be disclosed so First Connecticut shareholders can determine whether the range of multiples and range of illustrative equity values per share set forth in the Proxy actually reflect the true value of their interest in the Company.

45.    Similarly, with respect to Piper Jaffray's *Selected Companies Analysis*, the Proxy fails to disclose the individual multiples Piper Jaffray calculated for each company utilized.  *See* Proxy at 53-54.  For the same reasons mentioned above, the failure to disclose the individual multiples for each of the companies that were considered renders the summary of the analysis and the implied per share equity value reference ranges materially misleading.

46.    Finally, the Proxy also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

47.    Specifically, the Proxy states that through 2017, First Connecticut and Company

A had met and engaged in discussions which "focused on potential synergies and strategic fit of the two companies," Proxy at 43, and, on December 6, 2017, First Connecticut and Company A executed a non-disclosure agreement. *Id.* However, the Proxy fails to disclose whether the non-disclosure agreement contained a standstill provision and, if so, whether the agreement contained a "don't ask don't waive" ("DADW") provision, and whether such a provision fell away upon the execution of the Merger Agreement or still remained in effect. Such information is material to First Connecticut shareholders, as it bears directly on the ability of Company A to offer a better deal. The failure to disclose the existence of DADW provisions creates the false impression that Company A could have made a superior proposal. But that is not true. If the non-disclosure agreement contained DADW provisions, Company A could only make a superior proposal by breaching its agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the references to the non-disclosure agreement in the Proxy materially incomplete and therefore misleading as any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

48.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

49.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

51.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

52.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

53.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for First Connecticut, People's United, and the Synergies; (ii) the valuation analyses performed by First Connecticut's financial advisor,

Piper Jaffray, in support of their fairness opinion; and (iii) the background process leading to the Proposed Transaction.

54.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

55.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Piper Jaffray reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Piper Jaffray, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Piper

Jaffray's analyses in connection with their receipt of the fairness opinions, question Piper Jaffray as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

56.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

57.     First Connecticut is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

58.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

59.     Plaintiff incorporate each and every allegation set forth above as if fully set forth

herein.

60.      The Individual Defendants acted as controlling persons of First Connecticut within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of First Connecticut, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.      Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.      In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

63.      In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in

drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.       Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: August 14, 2018

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
          gegleston@gme-law.com

*Attorneys for Plaintiff*

**GOLDMAN & MINTON, P.C.**

              /S/
_____
Thomas J. Minton – No. 03370
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel.: (410) 783-7575
Fax: (410) 783-1711
*tminton@charmcitylegal.com*

*Attorneys for Plaintiff*