# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SELWYN KARP<br>32 MERRALL DRIVE<br>LAWRENCE, NY 11559<br>Individually and on Behalf of All Others<br>    Similarly Situated,<br><br>               Plaintiff,<br><br>  v.<br><br>FIRST CONNECTICUT BANCORP, INC.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>JOHN J. PATRICK, JR.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>ROBALD A. BUCCHI<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>JOHN A. GREEN<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>JAMES T. HEALEY JR.<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>PATIENCE P. MCDOWELL<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br><br>KEVIN S. RAY<br>ONE GLEN FARM ROAD<br>FARMINGTON, CT 06032<br>And<br><br>MICHAEL A. ZIEBKA | Case No.: 1:18-cv-02496<br><br>CLASS ACTION<br><br>CONSOLIDATED SHAREHOLDER<br>LITIGATION |

ONE GLEN FARM ROAD
FARMINGTON, CT 06032

                          Defendants.

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
## OF THE SECURITIES EXCHANGE ACT OF 1934

Lead Plaintiff Selwyn Karp ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the other former public shareholders of First Connecticut Bancorp, Inc. ("First Connecticut" or the "Company") against First Connecticut and the former members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of First Connecticut (the "Merger") by People's United Financial, Inc. ("People's United").

2.      On June 18, 2018, First Connecticut and People's United entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which First Connecticut shareholders would receive 1.725 shares of People's United common stock for each share of First Connecticut common stock they own (the "Merger Consideration").

3.      On August 22, 2018, the Board authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.  While Defendants touted the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they failed to disclose material financial information that was necessary for shareholders to properly recognize the inadequacy of the Merger Consideration, thereby rendering certain statements in the Proxy misleading.

4.      Rule 14a-9(a) prohibits proxy statements from: (i) containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact; and (ii) omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.  17 C.F.R. § 240.14a-9(a).

5.      When corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.

6.      Indeed, with respect to cash flow projections, which have been repeatedly recognized as material to shareholders faced with deciding whether to approve a merger or assess the value of their shares, there is a duty to speak **fully** and truthfully, and provide **complete** and non-misleading information.  In sum, if one speaks on a topic, he is bound not only to state the truth, but also not to suppress or conceal any facts within his knowledge which

will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.

7.     Consequently, the selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that would alter the overall valuation picture created by the disclosed numbers, is misleading.

8.     Here, the Defendants withheld two pieces of critical financial information, without which, it was impossible for First Connecticut shareholders to properly value their shares.  First, the Proxy entirely omitted projections for the after-tax free cash flows that First Connecticut was expected to provide equity holders through 2023 on a stand-alone basis (the "First Connecticut Cash Flows").  *See* Proxy at 55.  Second, the Proxy omitted the financial projections for the after-tax cash flows that People's United could provide equity holders through fiscal year 2023 on a stand-alone basis and on a pro forma basis, which included the Synergies, *see* Proxy at 56 (the "People's United Cash Flows," and together with the First Connecticut Cash Flows, the "Cash Flow Projections").  The Cash Flow Projections were analyzed by the Company's financial advisor, Piper Jaffray & Co ("Piper Jaffray"), formed the basis for and were in fac the key input in its valuation analyses, but were withheld from shareholders.  Indeed, it would have been impossible for Piper Jaffray to perform its valuation analyses in the manner that it did without the Cash Flow Projections.

9.     Furthermore, Piper Jaffray received assurances from the management of First Connecticut and People's United that the financial information it was provided with had been prepared on a reasonable basis, and Piper Jaffray assumed that the financial forecasts and

estimates (including the synergies) it reviewed were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments of the management of First Connecticut and People's United as to the expected future results of operations and financial condition of First Connecticut and People's United, respectively.  Proxy at 50.

10.     The omission of the Cash Flow Projections rendered the following two portions of the Proxy misleadingly incomplete: (i) the summary of the *Discounted Cash Flow Analysis* performed by Piper Jaffray on pages 55-56 of the Proxy; and (ii) the summary of the *Certain First Connecticut Prospective Financial Information* on pages 57-58 of the Proxy.

11.     On September 25, 2018, First Connecticut held a special meeting of shareholders to vote on the Merger.  On October 1, 2018, the Merger was consummated and, pursuant to the terms and conditions of the Merger Agreement, First Connecticut merged with and into People's United, with People's United as the surviving corporation.  Shareholders were not adequately informed when they voted to approve the Merger, because the Proxy omitted the material information and contained the misleading statements discussed herein, which impeded shareholders from recognizing the inadequacy of the Merger Consideration.  The materially incomplete and misleading Proxy was an essential link in the consummation of the Merger, as the Merger could not have been consummated without shareholder approval, which in turn could not have been obtained without the materially incomplete and misleading Proxy.

12.     For these reasons, as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

14.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with Maryland as to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the Defendants can be found, are inhabitants of, or transact business in this District; (ii) the conduct at issue had an effect in this District; (iii) First Connecticut was incorporated within this District; and (iv) Defendants have received substantial compensation via First Connecticut by doing business through, with and for First Connecticut, which was a Maryland corporation that maintained its principal office in Maryland at 2405 York Road, Suite 201, Lutherville Timonium, Maryland.

## PARTIES

16.     Plaintiff was, at all relevant times, a common shareholder of First Connecticut.

17.     Defendant First Connecticut was a Maryland corporation with its principal Maryland office located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland.  As a result of the Merger, First Connecticut merged with and into People's United, with People's United as the surviving corporation.

18.     Defendant John J. Patrick, Jr. was, at all relevant times, a director of First

Connecticut, and formerly served as the Company's President, Chief Executive Officer, Chairman of the Board.

19.     Defendant Ronald A. Bucchi was, at all relevant times, a director of First Connecticut.

20.     Defendant John A. Green was, at all relevant times, a director of First Connecticut.

21.     Defendant James T. Healey Jr. was, at all relevant times, a director of First Connecticut.

22.     Defendant Patience P. McDowell was, at all relevant times, a director of First Connecticut.

23.     Defendant Kevin S. Ray was, at all relevant times, a director of First Connecticut.

24.     Defendant Michael A. Ziebka was, at all relevant times, a director of First Connecticut.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of First Connecticut who received the Merger Consideration (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of August 20, 2018, there were 16,250,954 shares of First Connecticut common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public

shareholders of First Connecticut will be ascertained through discovery;

(b)   there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

     i.   whether Defendants misrepresented or omitted material information concerning the Merger in the Proxy, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

     ii.   whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

     iii.   whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote their shares for the Merger based on the materially incomplete and misleading Proxy.

(c)   Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)   Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the

relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    Background to the Merger

27.    Prior to the Merger, First Connecticut was positioned for growth as a stand-alone company.  Indeed, on January 13, 2018, the Company announced its Fourth Quarter 2017 Financial Results.  During the earnings call, former Company CEO John Patrick commented that "2017 was a good year for [the Company]," particularly "in light of the fact that [First Connecticut] didn't open any branches during 2017,"[1]  but the Company was excited to opening a new office in Manchester, Connecticut in March that, in John Patrick's words, would be a "great success." *Id.*

28.    Subsequently, on April 6, 2018, the Company announced its First Quarter 2018 Financial Results and, just as John Patrick mentioned during the prior quarter's earnings call, the Manchester location was an immediate success.  After being open less than one month, the Manchester office secured $25 million in deposits with 480 new customers.[2]

29.    But in spite First Connecticut's recent success, the Board was determined to sell First Connecticut as soon as possible, as evidenced by the Board's conduct following People's United's initial outreach in April 2018 and the subsequent absence of a sales process that would

---

[1]    *First Connecticut Bancorp's (FBNK) CEO John Patrick on Q4 2017 Results - Earnings Call Transcript*, Seeking Alpha (Jan. 25, 2018), https://seekingalpha.com/article/4140221-first-connecticut-bancorps-fbnk-ceo-john-patrick-q4-2017-results-earnings-call-transcript.

[2]    *First Connecticut Bancorp's (FBNK) CEO John Patrick on Q1 2018 Results - Earnings Call Transcript*, Seeking Alpha (April 19, 2018), https://seekingalpha.com/article/4164175-first-connecticut-bancorp-fbnk-ceo-john-patrick-q1-2018-results-earnings-call-transcript?part=single.

have helped generate a fair offer for the Company's shareholders rather than the unfair and inadequate Merger Consideration they ultimately received.

30.     In fact, upon receiving People's United's initial proposal, the Board went "all-in" on the possible merger with People's United instead of conducting, let alone considering, a sales process that could have resulted in a superior acquisition proposal.

31.     Undeniably, actions speak louder than words, and a mere two months after People's United made its initial proposal, First Connecticut and People's United entered into the Merger Agreement.

32.     Based upon the inadequate 1.75 per share exchange ratio, the Company's pre-Merger shareholders only held, in the aggregate, approximately 8.5% of the issued and outstanding shares of People's United's common stock immediately following the closing of the Merger.

33.     Following the announcement of the Merger, on June 27, 2018, Keefe Bruyette, an analyst Damon DelMonte, upgraded his price target for First Connecticut common stock from $29 to **$37** in light of the then-pending merger with People's United, which significantly exceeds the $32.31 implied valuation for the Merger Consideration as of August 20, 2018.

34.     Simply stated, the Board agreed to accept Merger Consideration that undervalued First Connecticut shareholders' shares.  And, as set forth in detail below, Defendants then negligently allowed a Proxy to be disseminated to the Company's shareholders that omitted material information—the Cash Flow Projections—that would have alerted First Connecticut shareholders to the fact that the Merger Consideration was inadequate and enabled them to proper assess the value of their shares.  As a result of the Proxy's material omissions, the Proxy presented a materially incomplete and misleading picture of First Connecticut's valuation and

future financial prospects and the Merger Consideration.

## II. The Proxy Omitted Critical Financial Projections, Which Rendered the Summary of Piper Jaffray's Valuation Analyses and First Connecticut's Projections Incomplete and Misleading

35.     On August 22, 2018, Defendants solicited First Connecticut shareholders to vote in favor of the Merger by causing the materially incomplete and misleading Proxy to be filed with the SEC and disseminated to the Company's shareholders.   The Proxy, which recommended that First Connecticut shareholders vote in favor of the Merger, omitted and misrepresented material information about the intrinsic value of the Company and its future prospects, and caused First Connecticut's shareholders to be misled when they voted in favor of the Merger without access to the below-referenced material information that was necessary for them to make an informed decision regarding whether to approve the Merger.

36.     Indeed, Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, as set forth herein, the Defendants breached that duty and were therefore negligent, as the omission of the Cash Flow Projections rendered specific portions of the Proxy misleadingly incomplete.

37.     It is not subject to serious challenge that information relating to the financial condition, solvency, and profitability of a company is plainly material to its shareholders. Complete and accurate financial projections are necessary for shareholders when deciding how to vote on a merger, because company managers and bankers with inside information have meaningful insight into a company's future that the market does not.   Thus, complete and

accurate projections speak directly to the question forced upon shareholders by a merger: does the merger consideration adequately compensate me for my shares?

38.     Therefore, when corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.  If one speaks on a topic, he is bound not only to state the truth but also not to withhold any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  The selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that alters the overall valuation picture created by the disclosed numbers, is misleading.

A.  <u>First Connecticut's Cash Flow Projections Were Material</u>

39.     Free cash flow projections are the single most important financial metric when valuing a company for sale.  For this reason, the disclosure of cash flow projections is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers.  In fact, in First Connecticut's most recent 10-K, Defendants acknowledge the importance of cash flows, referencing them 63 times throughout the filing.  However, here, Defendants conspicuously withheld any form of First Connecticut's after-tax cash flow projections from Company shareholders despite electing to include a table of projections on page 58 and incompletely "summarizing" Piper Jaffray's *Discounted Cash Flow Analysis* on page 55.

40.     The primary projection metric disclosed on page 58 (Net Income) *is not sufficient analog for the First Connecticut Cash Flows*.[3]  Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected Net Income.[4]  Piper Jaffray agrees, as indicated by their use of the First Connecticut Cash Flows—not Net Income—in performing their discounted cash flow ("DCF") analysis, and academics and practitioners concur.

41.     There are fundamental differences between free cash flows and net income.  A company's net income is a quite arbitrary figure obtained after assuming certain accounting hypotheses regarding expenses and revenues.  On the other hand, free cash flow is an objective measure, a single figure that is not subject to any personal criterion.[5]  As a leading financial expert explains:

> The classic definition of net income (revenues for a period less the expenses that enabled these revenues to be obtained during that period), in spite of its conceptual simplicity, is based on a series of premises that seek to identify which expenses were necessary to obtain these revenues. This is not always a simple task and often

---

[3]     The summary does not even disclose the required information for shareholders to independently calculate cash flow projections.  As seen on page 58 of the Proxy, the projections that were disclosed are only for the years ending December 31, 2018 and 2019.

[4]     Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet.  According to recent surveys, corporate and government officials have accepted this view; they rated **cash flow data the most important piece of information contained in published financial statements**.  The trend toward wider acceptance of this yard-stick has been building since the early 1970s.  Accelerating the trend have been several developments … that put greater distance between a company's net income and its cash flow.") (emphasis added).

[5]     Pablo Fernández, *Cash flow is a Fact. Net income is just an opinion*, (October 17, 2008), http://csinvesting.org/wp-content/uploads/2015/02/Cash-Flow-vs.-NI.pdf, also found as *Valuation Methods and Shareholder Value Creation*, Chapter 9 Cash Flow and Net Income, 2002 Academic Press, San Diego, CA.

> implies accepting a number of assumptions. Issues such as the scheduling of expense accruals, the treatment of depreciation, calculating the product's cost, allowances for bad debts, etc., seek to identify in the best possible manner the quantity of resources that it was necessary to sacrifice in order to obtain the revenues. Although this "indicator", once we have accepted the premises used, can give us adequate information about how a company is doing, the figure obtained for the net income is often used without full knowledge of these hypotheses, which often leads to confusion.

"Free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation.  The main advantage that free cash flow has over earnings is that it can't be manipulated as much."[6]  Simply stated, net income is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors, and is therefore a material financial metric to them.

42.     Further aggravating Defendants' failure to disclose the First Connecticut Cash Flows—which covered years 2018 through **2023**—is that the projections provided on page 57 of the Proxy only disclose financial projections for the fiscal years 2018 and **2019**.  In other words, First Connecticut shareholders were provided with projections that covered **less than half** the amount of time that Piper Jaffray had access to and utilized when preparing its DCF analysis in support of its fairness opinion.  As a result, First Connecticut shareholders could not even compare Net Income, or any of the other projections metrics, to the First Connecticut Cash Flows for the full time period.

43.     In sum, the First Connecticut Cash Flows were plainly material information which Defendants were negligent in omitting from the Proxy, especially since they were readily

---

[6]     David Thomas, *Why Free Cash Flow Is Better Than Earnings*, Shares and Stockmarkets, (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.

available, utilized by the financial advisor to value the Company, and were the key input in its most important valuation methodology.

B.  The People's United Cash Flows Were Material

44.     As discussed above, free cash flow projections are the single most important financial metric when valuing a company and its stock in connection with a merger.  While the stand-alone value of First Connecticut was of material importance to First Connecticut's shareholders, the fact that Merger Consideration was comprised of a fixed amount of People's United common stock made the value of People's United on both a stand-alone basis and pro forma basis equally as important.  In other words, the value of People's United's stock and, as a result, the Merger Consideration was also premised on People's United Cash Flows.

45.     Indeed, regardless of the form of the merger consideration being offered, the question shareholders need assess when faced with a change-of-control transaction is the same: is the value of the consideration being offered in the transaction fair value for their shares?  In regards to the Merger, First Connecticut shareholders needed the People's United Cash Flows to answer this question.

46.     The use of the People's United Cash Flows by Piper Jaffray indicates that they are the projections required to properly assess the fairness of the Merger Consideration and value of the People's United, both as a stand-alone entity and a pro forma basis, which accounted for the Synergies expected to result from the Merger.  By failing to disclose **any** projections for People's United, but most importantly the People's United Cash Flows, it was literally impossible for First Connecticut shareholders to compare the value their shares against the value of People's United's shares according to the approach favored by Defendants' own financial advisor, or even check that Piper Jaffray's inputs and assumptions were reasonable.  By

withholding the People's United Cash Flows, the Proxy skewed the financial picture of People's United and the Merger Consideration and prevented shareholders from assessing the value of First Connecticut and People's United independently, and impeded First Connecticut shareholders from recognizing the inadequate of the Merger Consideration.

47.     In sum, the financial analyses performed by Piper Jaffray clearly demonstrate that the most reliable and appropriate method of valuing People's United and the Merger Consideration was through the use of People's United's after-tax cash flows on both a stand-alone basis and pro forma basis.  However, the People's United Cash Flows were withheld from shareholders.   This constituted a material omission, which rendered the summary of the Discounted Cash Flow Analysis appearing on page 55-56 of the Proxy materially incomplete and misleading.

### III.     The Omission of the Cash Flow Projections Rendered the Following Portions of the Proxy Misleadingly Incomplete

#### A.  The Misleading Summary of Piper Jaffray's Discounted Cash Flow Analysis

48.     First, the omission of the Cash Flow Projections rendered the "summary" of Piper Jaffray's *Discounted Cash Flow Analysis* on pages 55-56 of the Proxy misleadingly incomplete. As set forth herein, Piper Jaffray could not have performed its DCF analyses without the Cash Flow Projections.  By withholding the Cash Flow Projections, First Connecticut shareholders were unable to properly assess the fairness of the Merger Consideration.  Simply put, a so-called "summary" of a valuation analysis is misleading if underlying assumptions or key inputs are omitted, particularly when shareholders are impeded from recognizing how significantly undervalued their shares are as compared to the "implied" valuation range they have been given because of the omission.

49.     To support their fairness opinions, financial advisors perform several types of

valuation analyses.  Here, Piper Jaffray performed a DCF analysis for First Connecticut and People's United, on both a stand-alone basis and pro forma basis, which included the Synergies. *See* Proxy at 55-56.  A DCF analysis is highly subjective and prone to manipulation to ensure the desired outcome—that the merger consideration and transaction at issue appear "fair" to shareholders.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses.  This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved.  However, there is still an element of subjectivity present in the choice and application of these methods.  **The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses**.
>
> There are a number of different underlying valuation analyses upon which a fairness opinion can rest.  The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis.  The preparer of a fairness opinion will typically utilize a weighted combination of these to arrive at a fairness conclusion.  The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances.  **For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus**.  However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.
>
> Each of the techniques in and of themselves is also prone to subjectivity.  **For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices,**

**which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**. However, again there is no standard-setting or other body guiding these or other preparation decisions. Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners. This lends itself to differences in valuation approach in each application and among institutions as each of them develops their own individual approach. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness**. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 AM. U. L. REV. 1557, 1573-78 (2006) (emphasis added).

50.     Exacerbating the financial ambiguity, , the Proxy entirely failed to disclose **any** financial projections for People's United and the Synergies that were expected to be generated by the Merger.

51.     Furthermore, as noted earlier, the Cash Flow Projections (the most important projected metric to understanding a DCF analysis) were not provided at all. By withholding the key input that formed the basis of Piper Jaffray's *Discounted Cash Flow Analysis* that was incompletely "summarized" in the Proxy, Defendants could hardly have done a better job of

obfuscating Piper Jaffray's financial analyses, even had they deliberately set out to do so.

52.     As noted on page 52 of the Proxy, "Piper [Jaffray] believes that its analyses and the summary of its analyses **must be considered as a whole** and that selecting portions of its analyses and factors or focusing on the information presented below in tabular format, without considering all analyses and factors or the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a potentially misleading or incomplete view of the process underlying its analyses and opinion." (emphasis added).  The Cash Flow Projections were indisputably the key input for Piper Jaffray's valuation analyses.  The failure to provide the most important financial projections that were necessary for the banker to conduct its valuation analyses did, in fact, create a misleading and incomplete view of the financial analyses performed by Piper Jaffray and the resulting implied valuation ranges.

53.     Simply stated, one cannot properly assess and recognize the legitimacy or lack thereof of a financial advisor's fairness opinion valuation analyses unless the key financial metrics and inputs associated with the analyses are disclosed.  Here, the Defendants allowed the Proxy to incompletely and misleadingly "summarize" Piper Jaffray's valuation analyses.  The summary of Piper Jaffray's *Discounted Cash Flow Analysis* on pages 55-56 of the Proxy was materially incomplete and misleading, because it failed to disclose the key inputs that were necessary for First Connecticut shareholders to fully recognize the illegitimacy of the analyses and assess how off-base the misleadingly low resulting implied equity value was.

B.  The Misleading Summary of First Connecticut's Financial Projections

54.     Defendants elected to summarize First Connecticut's financial projections on page 58 of the Proxy, but they excised and failed to disclose the most important projections—the First Connecticut Cash Flows.

55.     As stated above, the financial projections provided on page 58 of the Proxy do not include the cash flows that were used by Piper Jaffray in its *Discounted Cash Flow Analysis*. Therefore, the Company's financial projections cannot by any objective measure be considered a fair summary of the key inputs utilized by Piper Jaffray for its valuation analyses.  It strains all credibility to claim that disclosing a set of projections that were to be used by a financial advisor in connection with its fairness opinion for a board of directors, but omits the most important financial projection metric (*i.e.,* cash flows), constitutes complete and accurate disclosure.

56.     Furthermore, the omission of the First Connecticut Cash Flow Projections rendered the projection tables on page 58 of the Proxy incomplete and misleading because, without the First Connecticut Cash Flow Projections, the summary of *Certain First Connecticut Prospective Financial Information* provided a misleading overall valuation picture of First Connecticut.  In light of the significant differences, as discussed in detail above, between free cash flows on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—Net Income—the table of projections on page 58 of the Proxy presented a misleadingly incomplete overall valuation picture of First Connecticut.  By failing to include the First Connecticut Cash Flow Projections, the table provides an obfuscated valuation picture of the Company.  Simply put, free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

57.     In sum, the omission the of the Cash Flow Projections rendered the summary of Piper Jaffray's *Discounted Cash Flow Analysis* and First Connecticut's stand-alone financial projections provided in the Proxy incomplete and misleading, in contravention of the Exchange Act.  The materially incomplete and misleading Proxy was an essential link in the consummation of the Merger, as the Merger could not have been consummated without shareholder approval,

which in turn could not have been obtained without the misleading Proxy.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

58.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

60.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

62.     Defendants issued the Proxy with the intention of soliciting shareholder support for the Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which contained multiple misleading summaries and omitted critical information regarding the

Company's financial projections and Piper Jaffray's valuation analyses.

63.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

64.     Defendants knew or were negligent in not knowing that the Proxy was materially misleading and omitted material facts that were necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.  Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for First Connecticut and the details surrounding discussions with other interested parties and Piper Jaffray.  Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review Piper Jaffray's analyses in connection with their receipt of its fairness opinion, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

65.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.

Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the review of First Connecticut's financial projections and Piper Jaffrey's valuation analyses and fairness opinion.

66.     Each Individual Defendant was negligent as explained below:

      i.     Individual Defendant John J. Patrick, Jr. was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

      ii.     Individual Defendant Ronald A. Bucchi was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements

and summaries.

iii.   Individual Defendant John A. Green was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

iv.   Individual Defendant James T. Healey Jr. was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

v.   Individual Defendant Patience P. McDowell was negligent because, as a member of the Board, she reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow

Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and she nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

vi.   Individual Defendant Kevin S. Ray was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

vii.   Individual Defendant Michael A. Ziebka was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with Piper Jaffray, was aware of the existence of the Cash Flow Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and Piper Jaffray's valuation analyses, and he nevertheless approved the

dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

67.     First Connecticut is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

68.     As a direct and proximate result of the dissemination of the misleading Proxy Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger) in an amount to be determined at trial.   By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of First Connecticut within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of First Connecticut, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false, and misleading.

71.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of First Connecticut, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Merger.  The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger.  The Individual Defendants were thus directly involved in the making of the Proxy.

73.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

74.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

75.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered

damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.    Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: December 17, 2018

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341

**GOLDMAN & MINTON, P.C.**

_____/S/_____
Thomas J. Minton – No. 03370
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel.: (410) 783-7575
Fax: (410) 783-1711
Email: tminton@charmcitylegal.com

Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff and Lead Counsel for the Class*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
        gegleston@gme-law.com

*Additional Counsel for Plaintiff*

*Attorneys for Plaintiff and Liaison Counsel for the Class*

## Certificate of Service

I hereby certify that on this 17th day of December 2018, I filed the foregoing Amended Class

Action Complaint through the Court's ECF System, and that all counsel of record will be served

with copies through that system.

                                    /S/
                        Thomas J. Minton – No. 03370