**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SELWYN KARP, *Individually and On Behalf of All Others Similarly Situated*, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: RDB-18-2496 |
| | * | |
| FIRST CONNECTICUT BANCORP, INC., *et al.*, | * | CONSOLIDATED CLASS ACTION |
| | * | |
| Defendants. | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## MEMORANDUM OPINION

On June 18, 2018, Defendant First Connecticut Bancorp, Inc. ("First Connecticut") and People's United Financial, Inc. ("People's United") entered into an Agreement and Plan of Merger, pursuant to which First Connecticut shareholders would receive 1.725 shares of People's United common stock for each share of First Connecticut common stock they owned, leaving People's United as the surviving corporation.  (Consol. Am. Compl. ¶¶ 2, 17, ECF No. 29.)  This suit involves First Connecticut shareholders' claims that the proxy statement filed with the Securities and Exchange Commission ("SEC") and mailed to shareholders prior to the merger was materially misleading in violation of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1), and its implementing regulation, Rule 14a-9, 17 C.F.R. § 240.14a9(a), and that the members of the First Connecticut Board of Directors at the time of the merger are liable for the alleged error in the proxy statement under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  (*Id.* ¶ 1.) Specifically, the shareholder-Plaintiffs claim that First Connecticut and the members of the

Board omitted certain "cash flow projections" used by their financial advisor to create a "discounted cash flow analysis," and that such omission was materially misleading because the cash flow projections used in that analysis were meaningfully lower than projections presented to the Board in 2017.  According to the Plaintiffs, because the cash flow projections were not included in the proxy statement, the shareholders did not have the opportunity to realize that their shares were worth more than the consideration of $32.33 per share that they received in the merger with People's United.

Lead Plaintiff Selwyn Karp ("Lead Plaintiff" or "Karp") filed this suit on August 14, 2018 against Defendants First Connecticut and former members of the company's Board of Directors, John J. Patrick, Jr. ("Patrick"), Ronald A. Bucchi ("Bucchi"), John A. Green ("Green"), James T. Healey, Jr. ("Healey"), Patience P. McDowell ("McDowell"), Kevin S. Ray ("Ray"), and Michael A. Ziebka ("Ziebka") (collectively "the Directors" or "Individual Defendants"). (ECF No. 1.)  On November 7, 2018 this case was consolidated with that of Plaintiff Constance Lagace, No. RDB-18-2541, which had been filed on August 17, 2019. (ECF No. 23.)[1]  On September 24, 2019, this Court denied the Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 30), holding that the Plaintiffs had plausibly alleged the requisite elements of a Section 14(a) claim, and by extension the related Section 20(a) claim, on the basis of the omission of the cash flow projections from the proxy statement.  (ECF No. 36.)  As was noted in the Memorandum Order, this Court did "not engage in a fact-intensive test" at the motion to dismiss stage in this case.[2]  A different standard of analysis

---

[1] As Judgment shall be entered in favor of all Defendants in the consolidated cases of RDB-18-2496 and RDB-18-2541, both cases shall be CLOSED by Separate Order.
[2] *Id.* at 9-10 (citing *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019)).

now obviously applies in the context of a motion for summary judgment. Specifically, discovery now having been conducted, this Court is satisfied that there remains no genuine dispute as to any material facts in this case, and the Plaintiffs cannot prevail on their claims. Presently pending before this Court are the Lead Plaintiff's Motion for Summary Judgment (ECF No. 72 *SEALED*), as publicly redacted (ECF No. 77), and the Defendants' Cross Motion for Summary Judgment (ECF No. 78 *SEALED*), as publicly redacted (ECF No. 82). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the Lead Plaintiff's Motion for Summary Judgment (ECF No. 72 *SEALED*) is DENIED, and the Defendants' Cross Motion for Summary Judgment (ECF No. 78 *SEALED*) is GRANTED. Accordingly, judgment shall be entered in favor of the Defendants.[3]

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). When both parties file motions for summary judgment, as here, the Court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822 (2003); *see also*

---

[3] Also pending are the Lead Plaintiff Motion to Certify Class and Appoint Class Representative and Class Counsel (ECF No. 64) and the Defendants' Motion for Other Relief to Exclude the Opinions and Testimony of Plaintiff's Expert M. Travis Keath (ECF No. 79 *SEALED*), as publicly redacted (ECF No. 83). These motions are DENIED AS MOOT.

*havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles

A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

On June 18, 2018, First Connecticut and People's United entered into an Agreement

and Plan of Merger, pursuant to which First Connecticut shareholders would receive 1.725

shares of People's United common stock for each share of First Connecticut common stock

they owned, leaving People's United as the surviving corporation. (Consol. Am. Compl. ¶¶ 2,

17, ECF No. 29.) Lead Plaintiff Karp owned 8,901 shares of First Connecticut common stock

on the record date for the merger and through its completion. (Pls.' Ex. 1, ECF No. 77-3.)

Prior to the merger, Defendant First Connecticut was a Maryland corporation with its

principal executive offices located in Farmington, Connecticut. (Pls.' Ex. 2 at 41, ECF No.

76-1.) Individual Defendants Patrick, Bucchi, Green, Healey, McDowell, Ray, and Ziebka

served as Directors of First Connecticut at all relevant times. (Pls.' Ex. 3, ECF No. 77-4.)

On November 5, 2018, the Lead Plaintiff's case was consolidated with that of Plaintiff

Constance Lagace, RDB-18-2541. (ECF No. 23.) The now operative Consolidated Amended

Complaint asserts that although First Connecticut reported good financial results in 2017 and

a strong first quarter in 2018, the Directors decided to sell the company and responded eagerly

to People's United's initial outreach in April 2018. (ECF No. 29 ¶¶ 29-31.) The Plaintiffs

allege that First Connecticut and its Directors are liable under Section 14(c) of the Securities

Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder (Count I),

and that the Individual Defendants are liable under Section 20(a) of the Exchange Act (Count

II) because the Schedule 14A Definite Proxy Statement ("Merger Proxy") sent to shareholders

did not include cash flow projections.

**A. First Connecticut Merger with People's United and the Merger Proxy**

In April of 2018, People's United and First Connecticut met to discuss a business combination. (Pls.' Ex. 2 at 44, ECF No. 76-1.) On April 24, 2018, the Directors instructed First Connecticut's management to pursue a transaction with People's United. (*Id.*) On May 11, 2018, People's United presented its final offer of an exchange ratio of 1.725 to acquire First Connecticut. (*Id.*) According to the Defendants, People's United was not willing to offer an exchange ratio higher than 1.725, and if First Connecticut had rejected that offer, People's United was "willing to walk." (Defs.' Ex. 10 at 50:15-51:19, ECF No. 78-13 *SEALED*.) On May 14, 2018, the Directors approved the proposal and authorized Defendant Patrick to execute a non-binding letter of intent and begin a due diligence review process. (*Id.* *SEALED*.) On June 18, 2018, the Merger Agreement was agreed to and executed. (*Id.* at 44-45 *SEALED*.) Also on June 18, 2018, First Connecticut's financial advisor, Piper Jaffray & Co. ("Piper") delivered a fairness opinion to the Board, which concluded that the merger was fair to the company's shareholders. (*Id.* *SEALED*; *see also* Ex. 10, ECF No. 72-15 *SEALED*.) On June 19, 2018, First Connecticut and People's United announced the merger, stating that the First Connecticut shareholders would receive 1.725 shares of People's United common stock for each existing share of First Connecticut common stock, reflecting an implied cash value of approximately $32.33 for each share of First Connecticut common stock. (Pls.' Ex. 2 at 44-46, ECF No. 76-1.) The day before the merger was announced, First Connecticut common stock had been trading at $26 per share. (*Id.* at 46.)

On August 22, 2018, First Connecticut filed the Merger Proxy (Pls.' Ex. 2, ECF No. 76-1) with the SEC and disseminated it to its shareholders. The Board of Directors relied on

outside counsel to draft this Merger Proxy and to advise them on what information First Connecticut was required to disclose in the document. (Defs.' Ex. 1 at 125:13-20, 127:10-18, ECF No. 78-4 *SEALED*; Defs.' Ex. 9 at 51:8-14, ECF No. 78-12 *SEALED*.) The final 150-page document contained a 10-page summary of Piper's financial analysis presented to the Board in connection with its fairness opinion. (Pls.' Ex. 2 at 48-57, ECF No. 76-1.) The summary provided descriptions of the different financial analyses Piper performed, which contained granular disclosures regarding the assumptions Piper made and the data Piper relied on to prepare each analysis. (*Id.* at 53-56.) One of these analyses was the discounted cash flow ("DCF") analysis. Alongside the results of that analysis, the Merger Proxy disclosed that Piper assumed a discount rate of 11% to 13% and terminal value multiples ranging from 12.5x to 16.5x. (*Id.* at 55-56 *SEALED*.) The Merger Proxy also described how Piper calculated the cash flow projections used in the DCF analysis, stating "Piper used publicly available earnings estimates by research analysts covering First Connecticut which were discussed with senior management of First Connecticut, for fiscal years 2018 and 2019, and with respect to the fiscal years 2020 through 2023 applied an earnings growth rate of 8.0% to derive projected after-tax cash flows." (*Id.* at 55 *SEALED*.) The Directors received and reviewed a draft of the Merger Proxy and/or the almost identical Preliminary Proxy (filed with SEC on July 25, 2018), distributed before the Merger Proxy was finalized.[4]

## B. Plaintiffs' Objections to the Merger Proxy

---

[4] (*See* Defs.' Ex. 1 at 26:10-17, 35:14-22, 52:20-53:3, ECF No. 78-4 *SEALED*; Defs.' Ex. 4 at 43:22-44:4, 45:5-7, 45:21-25, 52:8-13, ECF No. 728-7 *SEALED*; Defs.' Ex. 5 at 57:24-58:4, 61:12-16, ECF No. 78-8 *SEALED*; Defs.' Ex. 6 at 42:14-43:5, ECF No. 78-9 *SEALED*; Defs.' Ex. 7 at 44:5-15, 47:5-11, ECF No. 78-10 *SEALED*; Defs.' Ex. 8 at 51:12-18, ECF No. 78-11 *SEALED*; Defs.' Ex. 9 at 48:12-49:11, 51:2-4., ECF No. 78-12 *SEALED*.)

The Plaintiffs allege that 150-pages of information in the Merger Proxy were insufficient.  Specifically, the Plaintiffs allege that the Defendants negligently allowed the Merger Proxy to be disseminated to the shareholders without the "cash flow projections," which the Plaintiffs allege, would have alerted the shareholders to the fact that they were being offered inadequate consideration for their shares in the merger.  (*See* ECF No. 29 ¶¶ 34, 36.) According to the Plaintiffs, the cash flow projections utilized by Piper in its fairness opinion and DCF analysis were "meaningfully lower" than projections presented to the Board of Directors in 2017.  (ECF No. 72-1 ¶ 37 *SEALED*.)

In June of 2017, Piper made a presentation to the Board at First Connecticut's annual "strategic planning meeting," which included a DCF analysis and the cash flow projections which supported such analysis.  (Pls.' Ex. 6 at 64, ECF No. 72-11 *SEALED*.)  In November of 2017, Piper made another presentation to the Board regarding a potential merger with another bank (which was never consummated).  (Pls.' Ex. 7, ECF No. 72-12 *SEALED*.) This presentation also included a DCF analysis and the corresponding cash flow projections used.  (*Id.* at 32 *SEALED*.)  The November 2017 board presentation forecasted cash flows of $▮▮▮▮ million for 2018, $▮▮▮▮ million for 2019, $▮▮▮▮ million for 2020, and $▮▮▮▮ million for 2021.  (*Id.* *SEALED*.)

At that time, Piper was not First Connecticut's financial advisor and did not consult with First Connecticut about the cash flow projections used to prepare the June and November 2017 DCF analyses.  (*See* Defs.' Ex. 22, ECF No. 78-25 *SEALED*; Defs.' Ex. 3 at 69:21-70:16, ECF No. 78-6 *SEALED*.)  According to Robert Hutchinson, who worked at Piper, the projections were based purely on his industry knowledge.  (*Id.* *SEALED*.)  Piper

later prepared its own set of cash flow projections to model the DCF analysis included in the Merger Proxy.  (Pls.' Ex. 11, ECF No. 72-16 *SEALED*.)  Piper's projections were as follows: $▮▮▮▮ million for 2019, $▮▮▮▮ million for 2020, $▮▮▮▮ million for 2021, $▮▮▮ for 2022, and $▮▮▮ for 2023.  (Pls.' Ex. 16, ECF No. 72-21 *SEALED*.)  These projections were not included in Piper's fairness presentation made to the Board on June 18, 2018 and were not included in the Merger Proxy distributed to shareholders.  (Pls.' Ex. 5 at 106:10-111:21, ECF No. 72-8 *SEALED*; Pls.' Ex. 10, ECF No. 72-15 *SEALED*; Pls.' Ex. 11, ECF No. 72-16 *SEALED*.)

The Plaintiffs allege that Piper's cash flow projections were "unjustifiably revised" downward by Piper, and that the Board was "oblivious to the machination."  (ECF No. 72-2 at 1 *SEALED*.)  The Plaintiffs assert that the 2018 Stand Alone Projections for First Connecticut reflected a more optimistic outlook for the Company than the 2017 Stand Alone Projections.  (*See* ECF No. 72-1 ¶ 37 (citing Pls.' Ex. 4 at 5, ECF No. 72-8 *SEALED* and Pls.' Ex. 14 at 5, ECF No. 72-19 *SEALED*).)  The Plaintiffs also assert that First Connecticut's financial performance "significantly improved" between November of 2017 and July of 2018.  (*See* ECF No. 72-1 ¶ 37 (citing Pls.' Exs. 12, 13, 15, ECF Nos. 72-17, 72-18, and 72-20 *SEALED*).)  From this information, the Plaintiffs conclude that "First Connecticut shareholders had no idea that they had been *downwardly adjusted*, even though the Company's financial prospects had *improved* during the same time period," or, in other words, "shareholders were not informed that the most important valuation analysis *purporting* to support the financial fairness of the Merger (the [DCF analysis]) was predicated on

unjustifiability and significantly lowered cash flow projections." (ECF No. 72-2 at 2 *SEALED* (emphasis in original).)

## C. Expert Reports and Opinions

The parties have each hired experts to testify in this matter. During discovery on October 9, 2020, the Plaintiffs submitted a report by M. Travis Keath, CFA, CPA/ABV, a Principal for a financial valuation consulting firm known as Value Incorporated. (Pls.' Ex. 16, ECF No. 72-21 *SEALED*.) In his report, Keath calculated the fair value of the First Connecticut common stock to be $35.51, $3.18 per share above the $32.33 valuation price announced in June 2018. (*Id.* *SEALED*.) Keath calculated this number using the November 2017 cash flow projections presented to the Board. (Pls.' Ex. 28 at 118:23-119:3, ECF No. 72-33 *SEALED*.) Keath opines in his report that the Merger Proxy "suffered from material shortcomings and omitted information critical to [First Connecticut]'s shareholders in their respective deliberations regarding whether to approve the Merger." (Pls.' Ex. 16, ECF No. 72-21 *SEALED*.)

Defendants have proffered the expert opinions and testimony of Dr. L. Adel Turki and Jonathan Foster. (ECF No. 78-1 ¶ 27 *SEALED*.) Dr. Turki is a Senior Managing Director at Compass Lexecon, an international economic consulting firm. (Defs.' Ex. 14, ECF No. 78-17 *SEALED*.) In his report, Dr. Turki details the results of an empirical study he performed in which he examined the proxy statements issued to shareholders in comparable bank mergers, some identified by Piper and used their in their report to the Board of Directors, and others identified using the Capital IQ database, a commonly-used source for mergers and acquisition transactions data. (*Id.* at 17 *SEALED*.) He specifically examined stock-for-stock

transactions within five years of the First Connecticut shareholder vote on September 25, 2018, where the target firm was, like First Connecticut, a commercial bank or savings institution with assets between $1 billion and $5 billion and the advisor performed a discounted cash flow ("DCF") analysis.  (*Id.* *SEALED*.)  Dr. Turki found that cash flow projections were disclosed in only one of the 44 of the proxy statements issued in these comparable bank mergers.  (*Id.* at 18 *SEALED*.)

Second, Dr. Turki reports the results of his studies of contemporaneous market evidence, which strongly support the conclusion that market participants, including First Connecticut shareholders, did not view the lack of cash flow projections as a consideration or a limitation in assessing the fairness of a merger.  (*Id.* at 25-27 *SEALED*.)  Accordingly, Dr. Turki asserted that there was no reason to believe that the "mere disclosure" of the cash flow projections would have caused (1) the merger consideration to be higher, or (2) a majority of the First Connecticut shareholders to vote against the merger and obtain a higher valuation than the one offered in the merger.  (*Id.* *SEALED*.)  In other words, Dr. Turki opined that there was no reason to believe that the lack of the cash flow projections in the Merger Proxy caused economic harm to First Connecticut shareholders.  (*Id.* *SEALED*.)

The Plaintiffs' expert, Keath, submitted a second report, responding to Dr. Turki's opinions, but did not specifically respond to his opinion that "the contemporaneous market evidence strongly supports the conclusion that market participants, including First Connecticut shareholders, did not view the lack of after-tax free cash flow projections as a consideration or a limitation when they assessed the fairness of the transaction."  (Defs.' Ex. 12, ECF No. 78-15 *SEALED*.)  In depositions, Keath, the Plaintiffs' own expert, made clear

10

that he had no expert opinion on whether the alleged omission of the cash flow projections caused economic damages to First Connecticut shareholders; any buyer would have paid more than the merger consideration if such projections had been disclosed; whether the Merger Proxy should have included the projections; or whether Piper should have used the November 2017 projections in its June 2018 DCF analysis. (*See* Defs.' Ex. 13 at 72:12-24, 75-15-24, 89:16-25, 80:22-81:1, 80:5-9, ECF No. 78-16 *SEALED*.)

Defendants' second expert, Jonathan Foster, is the Founder and a Managing Director of Current Capital Partners LLC, a mergers and acquisitions and restructuring advisory, corporate management services, and private equity investing firm. (Defs.' Ex. 15, ECF No. 78-18 *SEALED*.) In his report, Foster concludes that as a matter of custom and practice, when a merger proxy is required, members of the board of directors of the selling company review the merger proxy and sometimes provide comments on it before it is finalized, filed with SEC, and sent to shareholders, but they do not draft the merger proxy or decide on the inclusion or exclusion of specific items or seek to verify specific information in the document. (*Id.* *SEALED*.) He opines that the First Connecticut Directors acted consistently with custom and practice in their review and approval of the Merger Proxy in this case, including by not questioning whether the cash flow projections should have been disclosed in the Merger Proxy. (*Id.* *SEALED*.) The Plaintiffs did not submit a rebuttal to Foster's report.

### D. Procedural Background

On September 14, 2018, Lead Plaintiff Karp filed a motion for preliminary injunction, seeking to enjoin the shareholder vote on the merger in the event cash flow projections for First Connecticut were not disclosed. (ECF No. 13.) On September 25, 2018, prior to any

ruling by this Court with respect to disclosure of the cash flow projections, the shareholders voted to approve the merger.  (Pls. Ex. 3 ¶ 11, ECF No. 77-4.)  On September 27, 2018, Karp stipulated and agreed to withdraw that injunction motion.  (ECF No. 17.)  On October 1, 2018 the merger closed.  (Pls. Ex. 3 ¶ 11, ECF No. 77-4.)  On November 5, 2018, the Lead Plaintiff's case was consolidated with that of Plaintiff Constance Lagace, RDB-18-2541.  (ECF No. 23.)  On December 17, 2018, the Plaintiffs filed the now operative Consolidated Amended Complaint in which they allege that the Merger Proxy was materially incomplete and misleading, because it failed to provide cash flow projections.  (ECF No. 29.)  On January 29, 2019, the Defendants filed a Motion to Dismiss (ECF No. 30).  This Court denied the Defendants' Motion to Dismiss (ECF No. 30) on September 24, 2019, finding that there was initially a plausible claim presented.  (ECF No. 36.)  Lead Plaintiff Karp filed a Motion to Certify Class and Appoint Class Representative and Class Counsel (ECF No. 64) on November 20, 2020.  Having conducted discovery, on January 29, 2021, Lead Plaintiff Karp filed a Motion for Summary Judgment (ECF No. 72 *SEALED*), as publicly redacted (ECF No. 77).  The Defendants filed their Cross Motion for Summary Judgment (ECF No. 78 *SEALED*), as publicly redacted (ECF No. 82), as well as their Motion for Other Relief to Exclude the Opinions and Testimony of Plaintiff's Expert M. Travis Keath (ECF No. 79 *SEALED*), as publicly redacted (ECF No. 83) on March 10, 2021.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.   When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.   *Id.* at 249.   In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.   *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

As mentioned above, if both parties have filed motions for summary judgment, then this Court "must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Bacon v. City of Richmond*, 475 F.3d 633, 637-38 (4th Cir. 2007) (internal quotation marks omitted).   Regardless, this Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656-60 (2014) (per curiam).

## ANALYSIS

13

## I.     Section 14(a) & Rule 14a-9 (Count I)

After this Court's Memorandum Order denying the Motion to Dismiss (ECF No. 36) filed on September 24, 2019, Judge Hollander of this Court conducted a thorough analysis in a remarkably similar case in *Hurtado v. Gramercy Property Trust*, 425 F. Supp. 3d 496 (D. Md. 2019).  In that case, Judge Hollander granted the motion to dismiss a similar cause of action as set forth in this case.  The analysis in the *Hurtado* case provides guidance for this Court in addressing cross motions for summary judgment in the context of whether there are any genuine issues of material fact in this case, discovery now having been conducted.

The Plaintiffs have brought their claims under the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*  "The fundamental purpose of the Securities and Exchange Act is to implement a 'philosophy of full disclosure,' *Santa Fe Indus., Inc. v. Green*, 430 U.S 462, 477-78 (1977), by ensuring that the reasonable investor receives the information necessary to make informed investment decisions."  *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 246 (4th Cir. 1988) (citing *Hunt v. Robinson*, 852 F.2d 786, 787 (4th Cir. 1988) and *O'Brien v. Continental Illinois Nat. Bank & Trust*, 593 F.2d 54, 60 (7th Cir. 1979)).  Section 14(a) of the Exchange Act specifically prohibits "in contravention of such rules and regulations as the [SEC] may prescribe . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security."  15 U.S.C. § 78n(a)(1).  Rule 14a-9 was promulgated pursuant to this authority and "prohibits false or misleading statements with respect to material facts as well as the omission of material facts necessary to make the statements therein not false or misleading."  *Hayes v. Crown Central Petroleum Corp.,* 78 Fed. App'x 857, 861 (4th Cir. 2003) (citing 17 C.F.R. § 240.14a-90)).  The text of the rule provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . .

17 C.F.R. § 240.14a-9(a).

As this Court detailed in its previous Memorandum Order, to prevail on a claim for a violation of Section 14(a) and Rule 14a-9, a plaintiff must show that "(1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." (ECF No. 36 at 6 (citing *Hayes v. Crown Centr. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3rd Cir. 1992)).) "'The second and third elements have been termed "loss causation' and 'transaction causation,' respectively."' (*Id.* at 6-7 (*In re AGNC Inv. Corp.*, No. TDC-16-3215, 2018 WL 3239476, at *3 (D. Md. Jul. 3, 2018) (citations omitted).) Additionally, this Court noted that "'both the Supreme Court and the Fourth Circuit have expressly declined to determine the state of mind of a defendant required to establish § 14(a) liability."' (*Id.* at 7 (citing *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 535 (E.D. Va. 2017) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 n.7 (1976) and *Hayes*, 78 F. App'x at 864 n.1)). Some courts have concluded that negligence is enough to support liability under Section 14, while others "have required something more, at least for certain categories of defendants." *In re Willis Towers*, 937 F.3d at 307-08 (recognizing split of authority, citing cases). This Court accepted the Plaintiffs' previous allegations of negligence as sufficient at the motion to dismiss stage. (ECF No. 36 at 7.)

In this case there is no genuine dispute of material fact with respect to these main requirements for a Section 14(a) claim.  No reasonable jury could find from the evidence put forward by the Plaintiffs that omission of the cash flow projections was material, that the omission caused any loss to the shareholders, or that the members of the Board of Directors were negligent in allowing the Merger Proxy to be disseminated without such projections.  The Defendants are entitled to summary judgment in their favor.

### a.  Materiality

In this case, the Lead Plaintiff asserts that the cash flow projections were material and that their omission rendered the Merger Proxy misleading, as it caused the Discounted Cash Flow ("DCF") analysis to serve as only a "selective summary" of "certain First Connecticut prospective financial information."  (ECF No. 72-2 at 9.)  On September 24, 2019, this Court denied the Defendants' Motion to Dismiss, holding that under the minimal motion to dismiss standard, the Plaintiffs had sufficiently alleged a plausible claim that the missing cash flow projections were important to a reasonable shareholder when deciding how to vote on the merger.  (ECF No. 36.)  Since this Court denied the Defendants' motion, Judge Hollander had the opportunity in her *Hurtado* opinion to thoroughly consider the issue of materiality under the precedents of this Court, the U.S. Court of Appeals for the Fourth Circuit Court, and the U.S. Supreme Court.  *See Hurtado*, 425 F. Supp. 3d 496.  In consideration of Judge Hollander's opinion in *Hurtado* and reviewing the evidence revealed in discovery, it is now clear that there remains no genuine dispute as to any material fact related to the issue of materiality.  Omission of the cash flow projections was not material as required under Section 14(a).

Under the clear precedent of the U.S. Supreme Court, an omission in a proxy statement is not material unless "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus.*, 426 U.S. at 449. "The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *Id.* at 445. This standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.* at 449. That being said, under this standard "[t]here must be a substantial likelihood that the omission would have . . . significantly altered the total mix of information made available." *Hurtado*, 425 F. Supp. at 519 (citations and quotations omitted). While the materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him . . . if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question," the issue may be "appropriately resolved as a matter of law by summary judgment." *TSC Indus.*, 426 U.S. at 450.

Applying this materiality standard in *Hurtado*, Judge Hollander granted a motion to dismiss in a case where the plaintiff claimed that the company omitted from the proxy statement certain "comparator companies" used by the financial analyst and that such omission rendered the proxy misleading because it "'obscure[ed] a flawed and misleading assumption underlying [the financial advisor]'s analysis' that 'could have led shareholders to question the reliability of the Board's recommendation on the Merger.'" 425 F. Supp. 3d at 517. Viewing "the total mix of information available" to the shareholders, Judge Hollander found that the alleged omission was not material and that the plaintiff had failed to state a

claim for relief. *Id.* at 518. First, she noted that the proxy contained "extensive financial disclosures" and an "exhaustive" summary of the financial advisor's fairness opinion. *Id.* The proxy also detailed the "methodology and assumptions underlying each analysis." *Id.* at 519. Given such comprehensive disclosures, Judge Hollander found that the proxy provided shareholders with "more than enough information to decide how to vote." *Id.* She explained that "[t]o be sure, a reasonable shareholder *could* have found" the omitted information "helpful to his deliberations," and perhaps "*might* have," but such fact was "insufficient" under the clearly defined standard that there must be a "'*substantial* likelihood' that the omission '*would* have . . . significantly altered the total mix of information made available.'" *Id.* (emphasis in original). She held that "no reasonable juror could reach that conclusion," as the proxy statement "provided a thorough and accurate summary" of the financial advisor's work, and, accordingly, she dismissed the plaintiff's suit. *Id.* (citing *Kuebler v. Vectern Corp.*, 412 F. Supp. 3d 1000, 1008-10 (S.D. Ind. 2019)).

Even with the benefit of discovery, the Plaintiffs in this case have not shown that the 150-page Merger Proxy failed to provide a thorough and accurate summary of Piper's work. None of the Plaintiffs' witnesses, including their expert, has made such a statement. The Plaintiffs have simply failed to put forth any evidence that "there is a substantial likelihood that a reasonable shareholder would consider" the omitted cash flow projections were "important in deciding how to vote." *TSC Indus.*, 426 U.S. at 449. The Plaintiffs have not provided evidence that any First Connecticut shareholder was misled by the Merger Proxy or believed the cash flow projections were material. Even the Lead Plaintiff cannot remember whether he voted for or against the merger, or whether he voted at all, let alone what

information he relied on or considered in deciding how to act.   (Defs' Ex. 2 at 44:19-45:3, 45:18-46:2, 46:21-47:7; 48:4-10, ECF No. 78-5 *SEALED*.)   He admits he did not even read the allegedly misleading statements in the Merger Proxy. (*Id.* at 62:20-63:7, 132:17-134:23; 135:5-12 *SEALED*.)

Without any evidence that a single First Connecticut shareholder was misled by the Merger Proxy, believed the projections were material, or generally felt that the information provided in the Merger Proxy was inadequate, Plaintiffs' claims are based on "nothing more than some metaphysical doubt as to the material facts," which is "insufficient to withstand summary judgment." *Wolfe v. Bailey*, No. PX-16-1239, 2017 WL 2559145, at *3 (D. Md. June 12, 2017) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, as provided by the undisputed testimony of the Defendants' expert, Dr. L. Adel Turki, in only 1 of 44 comparable bank mergers were similar cash flow projections disclosed in the proxy statement distributed to shareholders.   (Defs.' Ex. 14, ECF No. 78-17 *SEALED*.)  To hold that the omission of cash flow projections in the context of this stock-for-stock merger was material would fly in the face of regular practice and is simply unsupported by the record in this case.  There is no genuine dispute as to material facts relevant to this issue.  No reasonable jury could find there is a *substantial* likelihood that a reasonable shareholder would have considered the cash flow projections important in deciding how to vote.

### b. Causation

Even if the Plaintiffs could show that the omission of the cash flow projections was material, the Lead Plaintiff still cannot prevail on his Motion for Summary Judgment, as there

is no genuine dispute of material fact relevant to the issue of loss causation, another requirement of a claim asserted under Section 14(a).

In denying the Defendants' Motion to Dismiss, this Court separately considered both types of causation required in a Section 14(a) action: loss causation and transaction causation. (ECF No. 36 at 10-12.)  Transaction causation is a form of reliance.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  To show transaction causation, a plaintiff must prove that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction" that resulted in the economic loss at issue.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970).  With respect to transaction causation, this Court held that under the circumstances of the case, the Merger Proxy was an essential link in the accomplishment of the merger and, given the Plaintiffs had adequately alleged a material omission, the Plaintiffs had adequately alleged a causal relationship between the Section 14(a) violation and the accomplishment of the merger.  (ECF No. 36 at 12.)

"Loss causation" on the other hand "requires a showing of 'a causal connection between the material misrepresentation and the loss.'"  *In re Envision Healthcare Corp.*, No. 18-1068-RGA, 2019 WL 3494407, at *8 (D. Del. Aug. 1, 2019) (quoting *Dura Pharm.*, 544 U.S. at 342).  The Private Securities Litigation Reform Act of 1995 "imposed . . . a loss causation requirement upon any 'private action' arising from the Securities Exchange Act."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008).  "The existence of a material misstatement or omission cannot by itself establish loss causation."  *In re GTx, Inc S'holders Litig.*, No. 19-Civ.-3239 (AT), 2020 WL 3439356, at *4 (S.D.N.Y. June 23, 2020).  A plaintiff

"must tie the misleading proxy statements directly to the economic harm suffered by [the plaintiff]." *In re Almost Family Secs. Litig.*, -- F. Supp. 3d --, No. 3:18-cv-00040-RGJ, 2020 WL 695654, at *4 (W.D. Ky. Feb. 11, 2020).

At the motion to dismiss stage, this Court considered the Plaintiffs' allegations that the materially misleading Merger Proxy resulted in an undervaluation of shares, which caused shareholders to receive less than the true value of their investment.  (ECF No. 36 at 10 (citing ECF No. 29 ¶ 68).)  This Court held that loss causation was a "'fact-based inquiry' that need not be proven until later stages of the litigation."  (*Id.* at 11 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005); *Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014).)

In his Motion for Summary Judgment, Lead Plaintiff Karp now argues that because there is no genuine dispute that the Merger Proxy was an essential link in the accomplishment of the merger, the Plaintiffs are entitled to damages if they suffered a financial injury or economic loss from the merger.  (ECF No. 72-2 at 15.)  He further asserts that the Plaintiffs can show damages of $3.18 per share because, according to their expert, the "fair value" of First Connecticut at the time of the merger was $35.51 per share ($3.18 more than the implied cash value of the merger consideration).  Karp does not, however, provide any arguments with respect to, or evidence to show, how the omission of the cash flow projections actually caused this $3.18 per share loss.

In *Gray v. Wesco Aircraft Holdings, Inc.*, the Second Circuit affirmed dismissal of a Section 14(a) claim where the plaintiff alleged that "shareholders had suffered an economic loss based on the difference between the merger consideration and the intrinsic fair value of the shares."

-- Fed. App'x --, 2021 WL 745310, at *2 (2d Cir. Feb. 26, 2021).  Because the plaintiff's complaint failed to allege that the fair value projections were "sufficiently likely, or that the shareholders faced a genuine choice 'between the Merger and the achievement of'" the projected stock value, the district court determined that the plaintiff had failed to state a claim for relief.  *Id.*  As the district court explained, "[t]o permit Plaintiff to recover damages on the assumption that had the Company remained independent, it would have achieved the results reflected in the Initial Management Projections, . . . would give him a 'windfall.'"  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 404 (S.D.N.Y. 2020).  The court noted that the proxy reflected that the merger consideration was "a significant premium to the value the shareholders themselves put on [the company's] stock prior to the merger announcement," pointing to the market price of the stock.  *Id.* at 405.  Without any allegations that the stock was "traded in an inefficient market or that the stock-market-value . . . was otherwise distorted leading up to the merger," there was no reason to doubt that the stock market value, "and not the fictional value" the plaintiff ascribed to the stock in the complaint, "represented the true alternative to the merger consideration."  *Id.* (citing *Basic v. Levinson*, 485 U.S. 224, 246 (1988)).

In this case it is undisputed that First Connecticut common stock was trading at $26 the day before the merger with People's United was announced.  (Pl.'s Ex. 2 at 46, ECF No. 76-1.)   The merger consideration price of $32.33 per share of First Connecticut common stock represented a 24.3% premium over that $26 price.  (*Id.*)  The Plaintiffs have not alleged that First Connecticut stock was traded in an inefficient market, or that the price of $26 was otherwise distorted.  The Plaintiffs have not shown that People's United or any other company would have paid more than $32.33 per share if the shareholders had rejected the merger.  In

fact, Defendants have put forward evidence that People's United was "willing to walk" if First Connecticut had rejected its final 1.725 exchange ratio offer.  (*See* Defs.' Ex. 10 at 50:15-51:19, ECF No. 78-13 *SEALED*.)  Further, the Plaintiffs have not shown that the shareholders would have even rejected the merger if the cash flow projections were included.  When asked whether the plaintiffs were damaged by the omission of the projections, the Plaintiffs' own expert clearly stated that he "did not opine on causation."  (Defs.' Ex. 13 at 75:15-24, ECF No. 78-16 *SEALED*.)  Meanwhile, the Defendants' expert opined that "the lack of cash flow projections could not have caused economic harm to the First Connecticut shareholders." (Defs.' Ex. 14 ¶ 46, ECF No. 78-17 *SEALED*.)  The Defendants contend that this undisputed testimony is fatal to the Plaintiffs' case: they assert that because the Plaintiffs lack expert evidence on loss causation and the Defendants' expert evidence on loss causation is undisputed, summary judgment should be entered for the Defendants.  *See In re Pfizer Secs. Litig.*, No. 4-cv-9866, 2014 WL 3291230, at *3 (S.D.N.Y. July 8, 2014) ("Plaintiffs' failure to proffer admissible loss causation and damages evidence is fatal to Plaintiffs' claims . . . .  Without a loss causation expert, Plaintiffs cannot prove [loss causation or damages] . . . .  Defendants are therefore entitled to summary judgment as a matter of law, and the Plaintiffs' claims are dismissed in their entirety.") (citations omitted).

In sum, this Court allowed the Plaintiffs to proceed to discovery, holding that loss causation was a "'fact-based inquiry' that need not be proven until later stages of the litigation." (ECF No. 36 at 11 (citations omitted).)  This case is now at that later stage, and the Plaintiffs have not proffered any facts to present a genuine issue of material fact.  It is clear that there is simply no evidence creating a genuine issue of material fact on the issue of loss causation, as

there is no evidence that First Connecticut shareholders would have received $35.51 per share for their stock if the cash flow projections had been disclosed.  The Defendants are entitled to summary judgment in their favor.

### c. Negligence

Finally, even if the Plaintiffs could show materiality or loss causation as required to succeed on a claim under Section 14(a), the Lead Plaintiff's Motion for Summary Judgment would still fail, as the Plaintiffs have failed to establish negligence on the part of First Connecticut and its Board of Directors.  As this Court noted above and stated in its previous Memorandum Order denying the Defendants' Motion to Dismiss, both the U.S. Supreme Court and the Fourth Circuit have expressly declined to determine the state of mind of a defendant required to establish Section 14(a) liability.  *Knurr*, 276 F. Supp. 3d at 535 (citing *TSC Indus.*, 426 U.S. at 444 n.7 and *Hayes*, 78 F. App'x at 864 n.1); *In re Willis Towers Watson*, 937 F.3d at 307-08 (recognizing split of authority, citing cases).  Given the split in authority on the topic, this Court was satisfied that initial allegations of negligence by First Connecticut and the Individual Defendants were sufficient to allow the Plaintiffs' case to survive a motion to dismiss.  (ECF No. 36 at 7.)  However, there is simply insufficient evidence for this case to survive a motion for summary judgment.

Assuming negligence is the relevant standard for the Defendants in this case, the Exchange Act defines negligence as:

> the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.  Such negligence may consist either of doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances.

24

*SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *17-18 (S.D.N.Y. Sept. 19, 2015) (internal citations and quotations omitted).   Rather than providing evidence to show the Defendants in this case acted without the appropriate level of care, the Lead Plaintiff now contends that when a communication seeking shareholder action contains a materially false or misleading statement or omission, the officers and directors who reviewed, authorized, or disseminated, or otherwise solicited shareholders via such document are negligent as a matter of law.  (ECF No. 72-2 at 13 (citing *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988); *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 989 (E.D. Mo. 1999); *In re Wells Real Estate Inv. Trust Inc. Secs. Litig.*, No. 1:07-CV-862-CAP, 2010 WL 11468441, at *10 (N.D. Ga. Aug. 2, 2010); *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 WL 1055966, at *9 (D. Or. Mar. 20, 2017); *Brown v. Brewer*, No. CV 06-3731-GHK (SHX), 2010 WL 2472182, at *14 (C.D. Cal. June 17, 2010); *In re Envision Healthcare Corp.*, No. 18-1068-RGA, 2019 WL 3494407, at *9 (D. Del. Aug. 1, 2019); *Fradkin v. Ernst*, 571 F. Supp. 829, 843 (N.D. Ohio 1983)).)  However, the Lead Plaintiff misstates the holdings of such cases: in each of the authorities cited, the defendants were alleged to have known, or proven to have known, that the relevant shareholder communication was misleading.  For example, in *Wilson*, the court stated that "[l]iability can be imposed for negligently drafting a proxy statement" and that "as a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy" the relevant negligence standard.  885 F.2d at 995.  But the court in *Wilson* did not hold that any material misstatement in a proxy establishes negligence.  The court clearly stated that the defendants in *Wilson* were negligent because they *knew* the proxy was misleading.  *Id.* (noting that the defendants "knew

of" the material omission two weeks before the shareholders voted on the merger and holding that the "nondisclosure was a deliberate decision" that demonstrated a culpable state of mind "far in excess of negligence"). In this case there is no indication that the Individual Defendants were aware of the omission of the cash flow projections, or that the projections used by Piper may have been erroneously low.

The Plaintiffs have provided no evidence that the Board of Directors failed to exercise reasonable care, nor have they alleged what the applicable standard of care in this case would be. In *SEC v. Shanahan*, the court held that without factual evidence regarding the applicable standard of care, "the jury could only speculate as to whether" the defendants "failed to exercise reasonable care." 646 F.3d 536, 547 (8th Cir. 2011). The Defendants argue that based solely on the Plaintiffs' failure to proffer evidence regarding the applicable standard of care, summary judgment should be entered in their favor. *Id.* (affirming district court's decision to grant summary judgment for defendant in Section 14(a) case because SEC failed to introduce any "probative evidence" regarding the defendant's duties as outside director and member of the Compensation Committee). Further, the Defendants' expert testimony on this topic was not disputed by the Plaintiffs. According to Jonathan Foster, as a matter of custom and practice, when a merger proxy is required, members of the board of directors of the selling company review the merger proxy and sometimes provide comments on it before it is finalized, but they do not draft the merger proxy or decide on the inclusion or exclusion of specific items or seek to verify specific information in the document. (Defs.' Ex. 15, ECF No. 78-18 *SEALED*.) He opined that the First Connecticut Directors acted consistently with custom and practice in their review and approval of the Merger Proxy in this case, including

by not questioning whether the cash flow projections should have been disclosed in the Merger

Proxy.  (*Id.* *SEALED*.)  The Plaintiffs have not provided any evidence that refutes this

testimony and have failed to proffer any evidence of negligence to create a genuine issue of

material fact.

## II.    Section 20(a) (Count II)

The Defendants are entitled to summary judgment on the Section 20(a) claim for the

reasons provided above with respect to the Section 14(a) claim.  Section 20(a) of the Exchange

Act provides that "[e]very person who, directly or indirectly, controls any person liable under

any provision of this chapter or of any rule or regulation thereunder shall also be liable."  15

U.S.C. § 78t(a).  A claim for controlling person liability must therefore "be based upon a

primary violation of the securities law." (ECF No. 36 (citing *Svezzese v. Duratek*, 67 F. App'x

169, 174 (4th Cir. 2003) (per curiam) (unpublished)).)  Without any such underlying violation

in this case, the Section 20(a) claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Lead Plaintiff's Motion for Summary Judgment (ECF

No. 72 *SEALED*), as publicly redacted (ECF No. 77), is DENIED.  The Defendants' Cross

Motion for Summary Judgment (ECF No. 78 *SEALED*), as publicly redacted (ECF No.

82), is GRANTED.  Judgment is entered in favor of the Defendants.

A separate Order follows.


Dated April 9, 2021

_____/s/_____
Richard D. Bennett
United States District Judge